[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an action brought in one count by SEMAC Electrical Contractors ("SEMAC") against Billows Electrical Supply Company ("Billows") in which SEMAC alleges that Billows breached a contract to supply electrical equipment. SEMAC was an electrical subcontractor for a construction project known as University of Connecticut South Campus Dormitory and Dining Facility (the "Project") and seeks to recover the sum of $41,780 from the defendant for the alleged breach of a contract to supply electrical equipment to it for the Project. The Billows defense is that no meeting of the minds existed sufficient to create a binding contract between Billows and the plaintiff for the UCONN project.
In April of 1997 the Suffolk Construction Company submitted a bid for work on the project naming SEMAC, a pre-qualified subcontractor for University of Connecticut, as an electrical subcontractor. SEMAC contacted several electrical Suppliers with requests that they submit price quotes for SEMAC's purchase of electrical equipment required for the project. These plans and specifications were made available to the various Suppliers including Billows at its New Britain office and were reviewed by Billows.
The bids were broken down into two basic categories, lighting fixtures and switch gear. On April 23, 1997 Billows submitted a quotation for lighting fixtures in the amount of $939,800 and for switch gear in the amount of $213,600 for a total quote of $1,143,400.
Suffolk was awarded the contract for the project with UCONN and Suffolk, in turn, awarded the electrical subcontract to SEMAC. In accordance with standard practice in the industry SEMAC then contacted each of the Suppliers who originally submitted a price quote requesting a best and final price quote from which SEMAC would award a contract for the electrical equipment. CT Page 3858
The lighting package on the UCONN south campus dorm project is a "proprietary specification". In other words this specification not only requires specific fixtures but the fixtures are required to be from specific manufacturers. Alan Powell, sales engineer for Billows, contacted Mr. Doug Weber, the SEMAC employee responsible for purchasing and the buyout of all the major portions of material for the project, and asked whether Billows would be allowed to provide "substitute fixtures" using different manufacturers than those required in the specifications and thus reduce the price of the quote. Mr. Powell hoped to provide equal fixtures of the same quality from manufacturers other than those listed in the specifications because he knew he could obtain a better price from these manufacturers. Mr. Weber indicated that SEMAC would in fact entertain substitute packages from other manufacturers. These specifications contained a 30-day substitute clause.
After some negotiations between the parties Billows submitted a final quote of $783,720.00 which represented a reduction of $369,680.00; approximately two-thirds of the original quote. Although Mr. Weber expressed concern over the price, Mr. Powell reiterated at that time that the reason he could reduce this offer by $370,000 was because his quote was based on "a substitute lighting fixture package". This original quote was made orally. After the discussions regarding the price and the package to be provided, Billows submitted a written quotation of $783,720.00 for both the switch gear package and the lighting package. He broke down this quote into two sub parts: $154,500 for the switch gear package and $683,720 for the lighting package.
On the first page of the lighting fixture quotation Mr. Powell indicated, in handwriting, the following:
"Note: Fixtures are listed as a reference to the schedule.
Price based on an approved equal."
Mr. Weber received the written quotation with the handwritten note. Weber then requested Billows to start preparing submittals.
On or about July 17, 1997 Mr. Powell realized that his bid package did not include automatic transfer switches. On July 29, after receiving the information on the transfer switches from CT Page 3859 SEMAC, Mr. Powell submitted a quote for the automatic switches for an additional $6,530.
While SEMAC maintains that there was a written contract between the parties made up of written purchase orders mailed by SEMAC to Billows which would have evidenced that the submission of shop drawings constituted a written contract, there is no satisfactory evidence that such purchase orders ever were received by Billows. Whatever the claims of SEMAC, there is no credible evidence that such purchase orders were actually sent to or received by Billows.
On August 1, 1997, Billows submitted "shop drawings" for the switch gear. These were rejected by the owner's engineer. On August 15, 1997 Billows submitted the shop drawings for the lighting fixture package. These were rejected by the engineer. The reason given for the rejection of the submittals was that the manufacturers listed in Billow's submittal were not the manufacturers listed within the specifications. The engineer indicated that the project's specifications required that request for substitution would be considered only within thirty days after the contract award or at a preconstruction meeting whichever occurred first. At the time Billows submitted its final quote this thirty day period had already expired. Thus, the owner would not accept or even consider a substitute package. Over the course of the next two to three months Billows attempted to work with SEMAC and the owners to put together a package that would be acceptable making at least three submissions of revised shop drawings.
Finally by letter to SEMAC dated November 16, 1997 Billows informed SEMAC that it had to increase its price to $949,600 an increase of $165,880 over the original package price of $787,183.20 because the owner refused to permit it to supply "or equal" equipment. SEMAC responded by letter dated November 28, 1997 advising Billows that it would seek to obtain the specified equipment from another supplier. By letter dated December 12, 1997, after a claim made by SEMAC that Billows had breached its contract, Billows maintained that it had not entered into any contract but had only made an offer to SEMAC Electrical Contractors to supply "or equal" material. SEMAC then proceeded to procure the electrical, equipment from other suppliers at an alleged increase of $41,780 in excess of Billow's original price. This is the basis of its claim against Billows. CT Page 3860
In the opinion of this court there was no contract between SEMAC and Billows. Billows had made an offer (counter offer) to SEMAC contingent upon getting its specifications approved. SEMAC was well aware of the original specifications and it was clear from the outset that Billows did not conform to the specifications and that Billows was making an offer contingent upon its ability to use "or equal" equipment with a substantial price saving. Since its offer was never accepted by the owner and therefore by SEMAC, no contract existed.
Judgment may enter for the defendant, Billows Electrical Supply Company.
Hale, J.T.R.